***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman with minor modifications.
 ***********
The undersigned finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between the defendant-employer and the plaintiff at all relevant times herein.
3. Defendant-employer was insured with National Compensation America Inc. at all relevant times herein.
4. An Industrial Commission Form 22 wage statement will be used to calculate plaintiff's average weekly wage. (No Form 22 was submitted to the Commission so no findings were made regarding plaintiff's average weekly wage.)
5. Plaintiff continued to receive compensation for temporary total disability as of the date of hearing before the Deputy Commissioner.
The parties stipulated into evidence 122 of medical records and reports.
The pre-trial agreement dated March 5, 2003 which was submitted by the parties, is incorporated by reference.
A Form 63 has been submitted in the case and is incorporated by reference.
 *********** EVIDENTIARY RULINGS
Defendant-Appellants' Motion to have the Full Commission receive new evidence is held in abeyance until plaintiff has had the opportunity to be evaluated and receive treatment by a doctor chosen with the assistance of a nurse from the North Carolina Industrial Commission Nurses' Section.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-nine years old, has a GED and has completed training to be a Certified Nursing Assistant I. In September 2001 she was employed by defendant-employer in Whiteville. Her job involved going to the homes of elderly clients and providing home care, which included washing their clothes, cleaning the house, cooking meals, bathing them, if necessary, and otherwise helping them with grooming. She would see one or two clients each day.
2. On September 10, 2001, plaintiff's regular client had a doctor's appointment so she was asked to go to the home of a supposedly bed-bound client who had had a stroke. She had never worked with this client before. Once at the client's home, his wife informed her that he was not bed-bound but would go to the table to eat breakfast and then would go lie on the couch. In order for the client to move from the table to the couch, plaintiff had to help him get out of his wheelchair. While she was helping him get up out of the wheelchair, he initially helped to raise himself up, but then abruptly slumped back, pulling her forward. She immediately felt pain in her low back so she sat down. When she sat down, she felt a popping sensation in her right hip.
3. Plaintiff went to her family doctor the next day with complaints of low back and right hip pain. Dr. Gerald's impression was that the pain in her hip was radicular in nature. He prescribed medication for a lumbar strain. Her symptoms worsened, however, so he referred her to Dr. Candella, an orthopedic surgeon. Dr. Candella examined her on September 19, 2001 and sent her to physical therapy. He subsequently ordered an MRI of her hip to rule out a possible injury there, but defendants refused to authorize it and insisted that plaintiff stop seeing Dr. Candella. They sent her to Dr. Foster, an orthopedic surgeon, in Wilmington.
4. Dr. Foster first examined plaintiff on November 14, 2001. Despite ongoing symptoms which limited her ability to function, he refused to prescribe anti-inflammatory or pain medication for her. He advised her to take over-the-counter medication and sent her to physical therapy. By November 28, 2001, plaintiff had low back pain, right groin pain, pain radiating down her right leg to her foot and she reported a catching sensation in her hip. Dr. Foster then ordered an MRI of her lumbar spine which he interpreted as showing some mild stenosis at L4-5 with no evidence of nerve root impingement. Consequently, he sent her back to physical therapy but continued to refuse to prescribe medication for her. Plaintiff experienced persistent pain in her back, hip and leg despite the physical therapy. The pain interfered with her sleep and her activities. In January of 2002, plaintiff reported numbness in her foot and giving way of her knee, so Dr. Foster ordered a myelogram/CT scan. The tests revealed a protrusion at L4-5 with possible slight nerve root impingement.
5. In keeping with the irregular treatment practices he had previously followed, Dr. Foster then gave plaintiff the option of a nerve root block or returning to work without restrictions. He then determined that the block should be administered at the L5 level even though the tests had only showed problems at L4-5 and not at L5-S1. On March 4, 2002, he performed the injection. Following the procedure, plaintiff experienced numbness and weakness in her legs such that she could not stand or walk and almost had to be admitted to the hospital overnight. Dr. Foster blamed her for the response and thought that he had done a fabulous job. He then determined that she had reached maximum medical improvement and ordered a functional capacity evaluation. The physical therapist would not perform the functional capacity evaluation, however, because plaintiff had not been followed recently for her mitral valve prolapse, so Dr. Foster released her to return to work at full duty.
6. On April 16, 2002, plaintiff sought treatment with Dr. Eskander and he ordered a functional capacity evaluation. The test was performed on April 22 and 23, 2002. Plaintiff was noted to have given maximum effort for the test and was found to be capable of only performing light work. After receiving notice of the functional capacity results, Dr. Foster gave her permanent restrictions but recommended no further treatment. Plaintiff's job with defendant-employer involved medium level work, so she still could not perform those duties. Her employer did not offer work suitable to plaintiff's capacity.
7. Plaintiff then requested a second opinion and was seen on July 9, 2002 by Dr. Rodger, an orthopedic surgeon. Dr. Rodger examined her and reviewed films from her MRIs. It was his impression that her symptoms came from an annular tear with disc bulging at L4-5 and from trochanteric bursitis. Dr. Rodger opined she did not have a surgical lesion so he recommended that she be treated by a doctor specializing in pain management.
8. No further treatment was provided to plaintiff by defendants. In view of Dr. Foster's statement that she might have a non-organic component to her problem, plaintiff's attorney sent her to Dr. Howard, a psychiatrist. Dr. Howard evaluated her on January 30, 2003. By that time plaintiff had become withdrawn, irritable, depressed and anxious. Although she had been quite active before her injury, she was spending most of her days in bed at that time. Dr. Howard concluded that she had developed a mood disorder secondary to the chronic pain she was experiencing as a result as her injury at work. In his opinion she was unable to work due to a combination of both her mood disorder and her pain disorder.
9. Dr. Howard subsequently reviewed her medical records and came to the conclusion that she had not received adequate treatment from Dr. Foster for her physical complaints. Dr. Howard prescribed a number of medications for her, both for her pain and for her psychological problems, but defendants would not pay for them and plaintiff could not otherwise afford them. She was only able to get one or two of them through the local mental health agency. Nevertheless, she reported improvement just from the Tegretol which Mental Health was able to supply. Dr. Howard continued to follow her until his deposition was taken on April 14, 2003. In his opinion she would not be able to return to work at any time soon without medical treatment.
10. Although defendants admitted liability for this claim, they denied liability for any treatment related to plaintiff's hip symptoms and for any treatment since Dr. Foster released her.
11. On September 10, 2001, plaintiff sustained an injury by accident to her back and to her right hip arising out of and in the course of her employment with defendant-employer. The fact that the patient she attempted to lift to an upright position suddenly went limp so that his weight dropped onto her constituted an unusual occurrence which interrupted her regular work routine. She experienced hip pain and back pain within seconds of this incident. Dr. Candella ordered an MRI of her right hip to rule out an injury to the joint which was not performed until February 13, 2002, but the test revealed no abnormalities in either of her hips. Rather, the symptoms in her hip were treated primarily as radicular symptoms from her back injury. Dr. Rodger diagnosed a condition related to her hip, trochanteric bursitis. However, in his opinion it was related to her injury by accident on September 10, 2001. The extent to which plaintiff did injure her hip, her injury was a proximate result of the accident at work on September 10, 2001 and plaintiff's right hip symptoms and back injury, which developed immediately after the accident, were causally related to plaintiff's injury by accident on September 10, 2001.
12. The defendants had notice within days that the plaintiff was alleging injuries due to her September 10, 2001 incident at work as reflected in the Form 63 signed by defendants on October 2, 2001. Moreover, defendants were put on written notice of plaintiff's alleged right hip injury on February 5, 2002 as it was alleged on the Form 18. Subsequent to defendants' filing a Form 63 in this matter and receiving a Form 18 that listed plaintiff's hip injury, no timely denial was made by defendants.
13. Plaintiff's complaints of pain and emotional distress have been found to be credible by the Full Commission.
14. Plaintiff did not receive appropriate treatment for this injury from Dr. Foster. For unknown reasons, his treatment did not appear to follow the normal standard of practice for treating symptoms such as she was reporting. Consequently, her symptoms became chronic and led to the mood disorder later diagnosed by Dr. Howard. Moreover, plaintiff had not reached maximum medical improvement at the time of the hearing before the Deputy Commissioner and required further treatment to address both her chronic pain and her depression. Defendants have failed to provide her with adequate treatment for these problems. Since their choice of doctor appears to have contributed to her ongoing symptoms and disability, it appears that plaintiff should be allowed to choose a doctor to provide the pain management recommended by Dr. Rodger with the assistance of a nurse from the North Carolina Industrial Commission Nurses' Section.
15. Due to her chronic pain and depression, plaintiff remained unable to work and earn wages through April 14, 2003 when Dr. Howard's testimony was taken.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned makes the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment and as a direct result of a specific traumatic incident of the work assigned on September 10, 2001 resulting in an injury to her back. N.C. Gen. Stat. § 97-2(6).
2. On September 10, 2001 plaintiff also sustained an injury by accident arising out of and in the course of her employment with defendant-employer. Her right hip symptoms and symptoms of mood disorder were a proximate result of this injury by accident. N.C. Gen. Stat. § 97-2(6); Click v. Pilot Freight Carriers, Inc.,300 N.C. 164 (1980).
3. Plaintiff is entitled ongoing compensation for temporary total disability until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from her injuries by accident, including the treatment for her back by Dr. Candella, the treatment of her hip symptoms and the treatment for her mood disorder. Plaintiff is also entitled to receive the pain management treatment recommended by Dr. Rodger with the assistance of a nurse from the North Carolina Industrial Commission Nurses' Section. N.C. Gen. Stat. §§ 97-2(19); 97-25.
5. In view of the problems associated with the treatment rendered by the doctor of defendants' choosing, plaintiff is allowed to choose a doctor to provide the pain management treatment recommended by Dr. Rodger with the assistance of a nurse from the North Carolina Industrial Commission Nurses' Section. N.C. Gen. Stat. § 97-25; Schofield v. The Great Atlantic Pacific Tea Company, Inc., 299 N.C. 582 (1980).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Subject to the attorney's fee hereinafter approved, defendants shall pay ongoing compensation to plaintiff for temporary total disability until further order of the Industrial Commission. Compensation due which has accrued shall be paid to the plaintiff in a lump sum.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from the treatment for her back by Dr. Candella and by Dr. Howard and those arising from treatment for her hip symptoms. Defendants shall also provide the pain management treatment recommended by Dr. Rodger by a doctor to be chosen by plaintiff with the assistance of a nurse from the North Carolina Industrial Commission Nurses' Section.
3. An attorney's fee in the amount of twenty-five percent of the compensation awarded is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to Mr. Hester. Defendants shall pay him every fourth check of ongoing compensation.
4. Defendants shall pay the costs.
This the ___ day of July, 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER